UNITED STATES, Appellee

v

RAYMOND A. LaBOSSIERE, Private First Class,
U. S. Army, Appellant

13 USCMA 337, 32 CMR 337

No. 15,901

November 9, 1962

*Captain Thomas Stapleton* argued the cause for Appellant, Accused.
*First Lieutenant Charles D. Reaves* argued the cause for Appellee,
United States. With him on the brief was *Major Francis M. Cooper.*

### Opinion of the Court

FERGUSON, Judge:

Tried by general court-martial, the accused was found guilty of conspiracy to commit larceny and larceny, in violation, respectively, of Uniform Code of Military Justice, Articles 81 and 121, 10 USC §§ 881 and 921. He was sentenced to dishonorable dis-

**337**

charge, forfeiture of all pay and allowances, confinement at hard labor for five years, and reduction to the grade of recruit. Reducing the period of confinement involved to two years, the convening authority otherwise approved the sentence. The board of review affirmed without opinion, and we granted accused's petition for review upon a contention that various declarations made by an alleged co-conspirator to certain witnesses out of the accused's presence constituted inadmissible hearsay. Resolution of this question requires a detailed inquiry into the testimony presented to the court-martial.

At the trial, the prosecution called, as witnesses for the United States, Specialist Potter and Privates Hubbard, Huffman, and Meekins. In substance, each of these was allowed to testify over objection that he had been individually approached by a Private First Class Taylor during the afternoon hours of June 27, 1961. Taylor broached a plan to enter the Technical Supply Yard, Camp Rice, Korea, and steal certain Government property stored therein. He told Hubbard, Huffman, and Potter that the accused was one of his confederates and sought their cooperation, as each had been assigned guard duty at the yard. Hubbard refused to participate and informed Taylor that Meekins had assumed his duties as sentinel. The others pretended to fall in with the plan. All, however, reported Taylor's intentions to their superiors.

Pursuant to arrangements made by Taylor, a meeting of the "conspirators" was held at approximately 9:00 p. m. on the evening of the 27th between two barracks huts in Camp Rice. It was attended by Taylor, Huffman, Meekins, Potter, and the accused. The men were gathered "in pretty close of a circle." Among other things, Taylor informed the group that the accused had been assigned the duty of watching the movements of the officer of the day, sergeant of the guard, and commander of the guard relief during the foray into the supply yard. As the meeting broke up, Huffman remarked to the accused that he "reckoned that things were fixed up now." The accused replied, "Right."

**338**

Huffman repeated that he guessed "everything's okay" and the accused said, "Okay." The parties then separated.

As a result of instructions received from their superiors, the guards involved permitted Taylor to lead a group of Korean nationals to the supply yard, allowing the Koreans to cut the perimeter fence and enter the yard itself. Once inside, this group broke into a warehouse and began to remove various items of Government property. Several noncommissioned officers and officers were lying in wait and apprehended both the Koreans and Taylor.

Approximately thirty minutes later, the accused was taken into custody. At the time, he was in his bed and appeared to be asleep. The sole evidence connecting him with Taylor, other than his presence at the final meeting, was testimony received from Private Hubbard to the effect that, at the end of Taylor's conversation with him in the early afternoon hours, accused had joined them. Hubbard was unable to say what part of the conversation accused might have overheard, but he knew he had approached only after Taylor "had finished just about all he had to say to me."

There was also testimony in the record that Taylor, at approximately 7:00 p. m. on the same evening, had contacted one Yi Man-sik and arranged for the participation of the Koreans in his nefarious enterprise.

Appellate defense counsel contends before us that the testimony of Hubbard, Potter, Huffman, and Meekins regarding Taylor's arrangements with them related solely to matters which occurred during the formation of the conspiracy and, hence, were inadmissible hearsay as to LaBossiere. They point particularly to the fact that accused, except through Taylor's out-of-court declarations, was not linked to the conspiracy prior to the group's evening meeting. On the other hand, the Government urges that, once accused was unequivocally shown to be a conspirator by his participation in that gathering, Taylor's prior statements became admissible to establish LaBossiere's

earlier entry into the unlawful agreement.

We must agree with the defense that the record of trial is devoid of any competent evidence to connect accused with the conspiracy and projected larceny until his attendance with ■ Taylor at the evening meeting of the parties. The sole other reference to him, *aliunde* the questioned conversations, is Hubbard's testimony that accused joined the witness and Taylor after the latter had "just about" finished. Hubbard was unable to recall whether accused overheard any portion of Taylor's discussion and, as thus depicted, the circumstance is so equivocal that no inference of accused's foreknowledge of Taylor's plans may be drawn. Moreover, we may not, as the Government suggests, rely on the content of Taylor's conversations with the various witnesses to establish the existence of a conspiratorial agreement with the accused, for such would permit the questioned evidence itself to furnish the predicate for its admissibility. We have long held that "bootstrapping" of this sort is impermissible. United States v Mounts, 1 USCMA 114, 2 CMR 20. As we said in that case, at page 119:

"... It would be faulty and circuitous reasoning with a vengeance to permit the questioned declaration itself to furnish the essential basis for its own guaranty."

See also United States v Webb, 12 USCMA 276, 30 CMR 276, and May v United States, 175 F2d 994 (CA DC Cir) (1949).

The question, therefore, turns on whether Taylor's conversations with the various witnesses constituted matters related to the formulation of the conspiracy or statements of a conspirator pursuant to and in furtherance of an unlawful combination. If the testimony falls within the latter class, it was admissible for, as is laid down in the Manual for Courts-Martial, United States, 1951, at page 252:

"A statement made by one conspirator during the conspiracy and in pursuance of it is admissible in evidence against his co-conspirators as tending to prove the truth of the matter stated. It is not admissible merely because it was made while the conspiracy was existing; it must, to be admissible under this rule, have been made in pursuance of the conspiracy. When evidence of such a statement is offered, it is a preliminary question for the court whether the conspiracy existed and whether the proffered statement was made in pursuance of it."

See also Paoli v United States, 352 US 232, 1 L ed 2d 278, 77 S Ct 294 (1957); Clune v United States, 159 US 590, 40 L ed 269, 16 S Ct 125 (1895); United States v Miasel, 8 USCMA 374, 24 CMR 184; and United States v Long, 2 USCMA 60, 6 CMR 60.

On the other hand, it is equally well settled that, as the Manual, supra, notes, such declaration—to be admissible—must be made "during the conspiracy" or, in the words of the Federal judiciary:

"It is elementary that a statement of a conspirator, in order to bind the coconspirator, must be a statement not made in the formation of the conspiracy, but after the conspiracy is formed, and in furtherance of its objects. It is then admissible against all upon the theory that each then speaks and acts for all, if speaking or acting in furtherance of the objects of the conspiracy." [Collenger v United States, 50 F2d 345, 348 (CA 7th Cir) (1931).]

Turning to the transcript, we are required to conclude that the conversations held by Taylor with Hubbard, Huffman, Potter, and Meekins, were, insofar as the record demonstrates, made prior to the conclusion of any conspiratorial arrangement. As hereinbefore noted, the evidence is singularly devoid of any circumstances indicating LaBossiere's participation in the conspiracy prior to the late evening meeting with the other persons involved. Admittedly, no agreement to commit larceny was concluded with Private Hubbard for his testimony makes it quite clear that he rejected

Taylor's overtures. Nor can it be argued that there was any conspiratorial arrangement between Taylor and any of the other guards whom he contacted. Regardless of their seeming compliance with his wishes, each promptly reported Taylor's intentions to his superior and actually only pretended to fall in with the planned theft of Government property. And it is well settled that there can be no conspiracy when a supposed participant merely feigns acquiescence with another's criminal proposal in order to secure his detection and apprehension by proper authorities. United States v Cascio, 16 CMR 799; United States v Siedentop, 58 BR 191; United States v Line, 1 BR 25; Odneal v State, 117 Tex Crim 97, 34 SW2d 595 (1931); 1 Wharton, Criminal Law and Procedure, § 83 (1957). Indeed, the first evidence which we discover of any conspiracy in this record occurs during the testimony concerning Taylor's meeting with Yi and the subsequent arrangement for the presence of the Koreans who actually entered the supply yard. And, as noted above, accused's connection with the plot was not shown until evidence of the 9:00 p. m. meeting was adduced.

Finally, we are impressed by the fact that each of Taylor's conversations with the various guards seem directed solely toward the formation of the alleged conspiracy rather than in pursuance of an unlawful agreement already in existence between the parties. Thus, he sought to induce each to abandon his duty as a sentinel and enter into the planned looting of the warehouses. Not until he obtained the apparent assent of each person necessary to the success of his plans did he seek Yi's assistance in employing the Koreans, and only after their enrollment did he hold the final meeting in which the plans were outlined and the plot brought to a state of readiness. Yet, each of the declarations which he made concerning the accused and his intention to enter and steal from the supply yard was made to the various witnesses hours before these efforts were organized.

In sum, then, we necessarily find, under the circumstances here depicted, that Taylor's conversations with Hubbard, Huffman, Potter, and Meekins—apart from those made at the evening meeting—constituted declarations made in forming the charged conspiracy rather than during its actual evistence and were, as the defense contended at the trial, inadmissible hearsay. Manual, supra; Collenger v United States, supra; Kamanosuke Yuge v United States, 127 F2d 683 (CA 9th Cir) (1942). As the other evidence regarding accused's guilt, consisting as it does solely of proof of his presence at the final meeting and comment to Huffman, is far from convincing, it is apparent that receipt of the improper testimony was prejudicial and requires reversal.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Army. A rehearing may be ordered.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

I agree with the majority's conclusion that Taylor's statements that others, including the accused, would participate in the offense were merely preliminary to the actual conspiracy. The evidence clearly indicates Taylor merely *assumed* the others would participate; and the assumption was based on the bare fact they agreed to attend the meeting he proposed. At that point in the proceedings, if there was any agreement between Taylor and the others, it was an agreement merely to discuss Taylor's proposal, not an agreement to engage in it.

Although the evidence was improperly admitted, it did not, in my opinion, prejudice the accused. The law officer specifically instructed the court-martial that it must find the accused to be a member of the conspiracy "without regard to and independently of the statements" of his participation by anyone else; only after it reached this finding could it consider declarations by others which were made in furtherance of the conspiracy. Undisputed evidence shows the accused was present at the time and

340

place of the scheduled meeting; he heard the arrangements for the offense, including the role he was to play in it; and he expressed affirmative agreement with those arrangements. With these direct, unequivocal acts and statements by the accused before it, it is unlikely, in my opinion, that the court-martial was influenced by Taylor's statements. Since there is no fair risk that the inadmissible evidence prejudiced the accused, I would affirm the decision of the board of review.